SILLS CUMMIS & GROSS P.C.
Michael J. Geraghty, Esq. (NJ Bar No. 026161987)
One Riverfront Plaza
Newark, New Jersey 07102-5400
Telephone: (973) 643-7000
Facsimile: (973) 643-6500
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IRONBOUND INTERMODAL INDUSTRIES,
INC., IRONBOUND EXPRESS, INC.,
CONTAINER SERVICES OF NEW JERSEY,
INC., MARINE TRANSPORT, INC.,
DAYBREAK EXPRESS, INC. AND
1111 DELANCY STREET LLC,

                          Plaintiffs,

vs.

CITY OF NEWARK,

                          Defendant.

Case No. 2:24-cv-_____

**VERIFIED COMPLAINT
FOR INJUNCTIVE AND
DECLARATORY RELIEF**

Plaintiffs Ironbound Intermodal Industries, Inc., Ironbound Express, Inc., Container Services of New Jersey, Inc., Marine Transport, Inc., Daybreak Express, Inc., and 1111 Delancy Street LLC ("Plaintiffs"), by way of complaint against defendant City of Newark, allege and state:

## NATURE OF THE ACTION

1.      This is a suit for declaratory and injunctive relief against enforcement by the City of Newark ("City") of Ordinance 6 PSF-a 06/05/2024 ("Ordinance"), which levies unauthorized and exorbitant license fees on the storage of shipping containers within the City as a revenue generating measure. The Ordinance, which was adopted by the Municipal Council and took effect on June 25, 2024 ("2024 Ordinance"), is beyond the scope of the City's police power

under N.J.S.A. 40:48-2 in that it arbitrarily and capriciously imposes license fees to generate revenue beyond the cost of regulation.

2.      The 2024 Ordinance also denies the affected businesses equal protection of the law, in violation of the Fourteenth Amendment to the United States Constitution ("U.S. Constitution") and New Jersey Constitution ("N.J. Constitution") Art. I, § 1, by exempting from its financial and other requirements identically situated container storage and handling businesses that are tenants of the Port Authority of New York and New Jersey Authority ("Port Authority"). It also violates the Interstate and Foreign Commerce Clause of the U.S. Constitution by imposing an excessive financial burden that deters the storage of shipping containers used in interstate and foreign commerce.

3.      The plaintiff container storage and handling businesses located in the proximity of Port Newark request a declaratory judgment that the 2024 Ordinance is contrary to the U.S. Constitution, the N.J. Constitution and New Jersey statute law and a permanent injunction enjoining the enforcement of the collection of the unauthorized license fees and requiring the refund of those fees collected.

## JURISDICTION AND VENUE

4.      The Court's jurisdiction is based on 28 U.S.C. § 1331 for questions arising under the Constitution of the United States; 28 U.S.C. § 1343 to redress the deprivation of any right or privilege under the United States Constitution; and 28 U.S.C. § 1367(a) for questions arising under the laws of New Jersey from the same operative facts.

5.      This Court may declare the legal rights and obligations of each of the parties in the action pursuant to 28 U.S.C. §§ 2201 and 2202 because the action presents an actual case of controversy within the Court's jurisdiction.

6.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for the claims brought under New Jersey law.

7.      Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) in that Defendant City of Newark is located within this judicial district and the events giving rise to Plaintiffs' claims arose in this judicial district.

## **PARTIES**

8.      Plaintiff Ironbound Intermodal Industries, Inc. ("Ironbound Intermodal") is a corporation of the State of New Jersey with its principal place of business located at 65 Jabez Street Newark, New Jersey 07105.

9.      Plaintiff Ironbound Express, Inc. ("Ironbound Express") is a corporation of the State of New Jersey with its principal place of business located at 65 Jabez Street Newark, New Jersey 07105.

10.     Plaintiff Container Services of New Jersey, Inc. ("Container Services NJ") is a corporation of the State of New Jersey with its principal place of business located at 400 State Rt. 34, Matawan, New Jersey 07747.

11.     Plaintiff Marine Transport of New Jersey, Inc. ("Marine Transport") is a corporation of the State of New Jersey with its principal place of business located at 400 State Rt. 34, Matawan, New Jersey 07747.

12.     Plaintiff Daybreak Express, Inc. ("Daybreak Express") is a corporation of the State of New Jersey with its principal place of business located at 500 Avenue P, Newark, New Jersey.

13.     Plaintiff 1111 Delancy Street LLC ("Delancy") is a limited liability company of the State of New Jersey with its principal place of business located at 500 Plaza Dr., Secaucus,

New Jersey 07094.

14.     Defendant City of Newark is New Jersey municipal corporation organized and operating pursuant to N.J.S.A. 40A:63-1 to -7 with an address at City Hall, 920 Broad Street, Newark, New Jersey 07102.

**FACTS COMMON TO ALL COUNTS**

A.      **Off-Port Trucking and Container Companies Are Critical to Port Newark**

15.     Port Newark was the birthplace of the container industry in the United States. Since 1956, when the first ship carrying containers sailed from Port Newark to Houston, the Port Newark-Elizabeth Marine Terminal (comprised of Port Newark and Port Elizabeth) has grown into an integral component of the Port of New York and New Jersey ("Port").

16.     Presently, the Port, including the Port Newark portion of the Newark-Elizabeth Marine Terminal ("Port Newark"), is one of the largest container complexes in the world. The Port Authority operates the Port and leases cargo terminals to private marine terminal operators in Port Newark and the adjacent Port Elizabeth terminal including Port Newark Container Terminal, LLC.

17.     The City owns the approximate 957 acres of land that sit underneath the Port Newark land. It leases that real property to the Port Authority pursuant to a long-term lease through 2075. The Port Authority pays rent and other sums to the City annually to lease the property of approximately $25 million.

18.     Containers are made in standardized lengths, determined by the International Standards Organization ("ISO"), of 20 feet, 40 feet, 53 feet and 56 feet. In shipping industry practice, the volume of goods shipped by container is measured in 20-foot equivalent units ("TEU").

19.     With an annual container volume of approximately 7.8 million TEUs in 2023, the Port is ranked second in the nation for container throughput and is the busiest port on the East Coast. Port Newark Container Terminal, which occupies 272 acres in Port Newark, handles more than 1.3 million TEU containers annually.

20.     One of the most attractive features of Port Newark is its proximity to major transportation corridors including the New Jersey Turnpike and several other major highways. Some 80% of the containers imported to Port Newark are placed on trailers and trucked. This makes it easy for companies to move goods to and from Port Newark and allows for quick and efficient distribution of cargo throughout the tri-state region and states throughout the country.

21.     One of the main challenges facing Port Newark is the lack of space for container storage and handling. The demand for container storage space has grown significantly in recent years, and Port Newark has struggled to keep up with the demand. As a result, multiple lots where containers are stored are operated off-Port by private owners and operators.

22.     The volume of imports through the Port greatly exceeds the volume of exports. As a result, empty containers accumulate temporarily. Although the terminals in Port Newark have areas used for stacking empty containers, the Port Authority prohibits the long-term storage of empty containers in Port Newark and other areas within its control. Shipping companies therefore pay to have these empty containers stored temporarily outside the Port ("grounded containers") until they can be shipped back empty to exporting destinations for reuse. The shipping line or other container owner determines how long the container remains in storage.

23.     Since the COVID-19 pandemic, Port Newark has been experiencing record import volumes, increasing the demand for space to store containers while waiting to be trucked out.

24.     Operators of businesses in Newark located outside Port Newark ("Off-Port") that use intermodal containers either in transit or to be stored including, but not limited to, trucking companies, chassis companies, storage companies ("Container Storage Operators") play a vital role in the region's supply chain. The Container Storage Operators provide a "pressure relief mechanism" when marine terminal storage becomes scarce due to vessel bunching or unusually high freight volumes.

25.     Container Storage Operators were essential in maintaining fluidity during the COVID-19 pandemic and continue to be valuable to the Newark community that takes pressure off the Port. In the aftermath of the pandemic, the Off-Port Container Storage Operators remain well-positioned to capitalize on increasing Port traffic and the scarcity of outdoor storage spaces proximate to the Port.

**B.       Intermodal Shipping Containers In Interstate and Foreign Commerce**

26.     Intermodal shipping containers ("containers") are sealed metal containers in specially designed semi-trailers. Since they were first introduced approximately 70 years ago, containers have become the predominant medium for the long-distance shipment of cargo in interstate and foreign commerce because they can be loaded at the point of origin, sealed, and not unloaded until the point of destination. Containers can be loaded directly from ship to truck or rail car and vice versa, thereby reducing the amount of labor required at transshipment points and reducing the possibility of breakage, loss or theft in transshipment compared to traditional "break bulk" cargo.

27.     Containers are ordinarily owned by shipping companies, rail carriers, and equipment leasing companies. Each container has its own identifying number. Containers are used interchangeably without regard to ownership. The Uniform Intermodal Interchange and

Facilities Access Agreement (UIIA) is a standardized contract that governs the relations between shipping lines and motor carriers for the handling and return of containers. (A copy of the UIIA is attached as Exhibit A).

28.     Under the UIIA, the motor carrier receives the container from the shipping line at any one of the terminals at Port Newark and must return the container to the shipping line at either the terminal or another location designated by the shipping line within a stated number of days or pay demurrage charges.

29.     Loaded containers are moved from one of the terminals in Port Newark to their destinations and empty containers are returned by mounting on specialized semi-trailer wheeled chassis ("trailered containers"). Loaded containers must be picked up by the consignee's trucking company at the container terminal when unloaded from the ship, placed on a wheeled chassis and brought to any of the multiple trucking companies in the outside Port Newark. If the consignee is unable to receive the container immediately, the trailered containers are parked temporarily overnight at the trucking companies' Newark location until they head to their delivery destination within 24 hours.

30.     The Federal Motor Carrier Safety Administration of the U.S. Department of Transportation ("FMCSA") is charged with responsibility for implementing safety measures designed to reduce fatalities and injuries involving large trucks. Pursuant to the Federal Motor Carrier Safety Regulations ("FMCSR") promulgated by the FMCSA, trailered containers must adhere to standards established for securing containers while being transported on roads across the country.

31.     Empty containers are stored in stacks that can physically be as high as seven containers. Because they are interchangeable, the most accessible containers are ordinarily

returned to shipping lines on a last-in, first out basis unless the shipping line requests specific containers by identifying number.

32. Because of their sturdy construction, containers can also be used for temporary or permanent storage. For example, Plaintiff Daybreak Express owns and permanently maintains 1,600 containers that the New York Metropolitan Opera uses to store the scenery for various opera productions. The appropriate containers are trucked to the Metropolitan Opera at Lincoln Center as needed and returned to Daybreak Express for storage.

C. **The Plaintiffs' Use of Containers in Their Respective Operations**

33. The Plaintiffs are Container Operators and/or owners of Off-Port premises where grounded or trailered containers are maintained. Although the plaintiffs are the parties-in-interest in this action, there are dozens, if not more, of other Off-Port Container Operators similarly situated to the Plaintiffs that are also negatively impacted by the 2024 Ordinance.

34. Certain of the Container Operators that conduct business Off-Port are considered as a "marine terminal facility" for purposes of N.J.S.A. 54:32B-8.12, which exempts a "marine terminal facility" from the obligation to pay sales tax on charges for storage services and repairs of personal property. In that statute, the term "marine terminal facility" includes an operator's off-site container depots because they are necessary or convenient to the accommodation of steamships or other vessels and their cargoes arriving at Port Newark.

(i) **Ironbound Intermodal and Ironbound Express**

35. Ironbound Intermodal and its affiliate, Ironbound Express, provide complete services to the steamship industry including, but not limited to, reefer department operations, equipment repair, chassis, container storage, and heavy lift operations.

36. Ironbound Intermodal operates a 13.5-acre container storage facility at 19-3 Hyatt

Avenue, Newark, New Jersey. ("Ironbound Intermodal Site"). The Intermodal Site is double fenced with a wall of containers inside the inner fence. It is lit and guarded. The premises are zoned for the storage of containers. (A copy of an aerial depiction of the Ironbound Intermodal Site is attached hereto as Exhibit B.)

37.     The Ironbound Intermodal Site currently holds approximately 2,400 grounded containers, of which 800 are temporarily stored empties and 1,600 are the permanently stored containers owned by Daybreak Express that are used to store Metropolitan Opera scenery. The maximum grounded container capacity of the Ironbound Intermodal Site is approximately 2,400 containers.

38.     Ironbound Intermodal stores empty containers for shipping lines until the shipping line requests them for shipment empty back to exporting ports in Asia and elsewhere. Those empty containers are stored on the Ironbound Intermodal Site for periods of less than 30 days to up to 90 days and more for certain containers.

39.     Unless the shipping line requests a specific container, for which there is a charge, Intermodal Industries returns the number of containers requested based on accessibility on a last-in, first out basis. A portion of the containers are continuously moved in and out of the Ironbound Intermodal Site.

40.     Ironbound Intermodal subleases a 2.5-acre site at 18-3 Hyatt Avenue to American Cargo Enterprise, LLC ("American Cargo Site"). At the American Cargo Site, trucks pick up containers installed on chassis and transport them to their destinations. The American Cargo Site could hold approximately 70 trailered containers for storage. (A copy of an aerial depiction of the American Cargo Site is attached hereto as Exhibit C.)

41.     Ironbound Express is a trucking company affiliated with Ironbound Intermodal.

Ironbound Express uses a 3.5-acre portion of the Intermodal Site. It transports general freight, intermodal, and other types of freight including trailered containers. The portion of the Ironbound Intermodal Site is partially lit and enclosed by fencing Guard Dog™, which is electrified, and provides the highest standard of perimeter fencing in the security industry.

42.     Ironbound Express does not store grounded containers on the Ironbound Intermodal Site. It does park trailered containers on its premises temporarily until they can be delivered. At any given time, Ironbound Express's portion of the Ironbound Intermodal Site can hold a maximum of approximately 100 trailered containers.

(ii)     <strong>Container Services and Marine Transport</strong>

43.     Container Services has premises at 15 Stockton Street, Newark, New Jersey ("Container Services Site"). The Container Services Site is fenced and guarded with video surveillance. The premises are zoned for the storage of containers. (A copy of an aerial depiction of the Container Services Site is attached hereto as Exhibit D.)

44.     Container Services stores empty containers for shipping lines. It also repairs containers on site and has an on-site inventory of containers for sale or leasing. At any given time, there are between 800 and 1200 grounded containers on site. Depending on the reason for the container being there, a container may be on site for less than 30 days or 90 days or more. At any given time, the Container Services Site can hold a maximum of approximately 1200 grounded containers for storage.

45.     Marine Transport is an affiliate of Container Services. Marine Transport has its premises comprised of 3.4 acres at 544 Delancy Street, Newark ("Marine Transport Site"), New Jersey. Marine Transport is a trucking company that transports fully containerized freight throughout the East Coast, Midwest, and Atlantic Seaboard regions. (A copy of an aerial

depiction of the Marine Transport Site is attached hereto as Exhibit E.)

46.     Marine Transport does not store grounded containers on its premises. It does park trailered containers on site temporarily. The Marine Transport site is fenced and guarded. At any given time, the Marine Transport Site could hold approximately 150 trailered containers.

### (iii)     Daybreak Express

47.     Daybreak Express is a trucking company that transports fully containerized freight throughout the East Coast and other regions in the U.S. Daybreak Express has premises on (a) approximately 5.5 acres at 500 Avenue P, Newark, New Jersey ("Ave. P Site I"); (b) approximately 2.8 acres at 441 Avenue P, Newark ("Ave. P Site II"); and (c) approximately 5.6 acres at 52 Amsterdam Street, Newark. ("Amsterdam Site"). (A copy of an aerial depiction of the Ave P. Site I, Ave. P Site II and the Amsterdam Site are attached hereto as Exhibits F, G and H, respectively.)

48.     The Ave P Site I and Ave. P Site II each have high security-controlled access by gate, are enclosed by a fence, cameras covering every angle of the fence with an alarm and patrolled by in-person security. The Amsterdam Site is accessed by an electronic gate, enclosed by a fence and patrolled by in-person security.

49.     Daybreak Express does not store grounded containers on the Ave. P Site I, Ave P Site II or Amsterdam Site. However, it does temporarily park trailered containers those sites while waiting to travel to their respective delivery destinations.

50.     At any given time, the Ave P Site I can hold up to approximately 120 trailered containers. The Ave. P Site II can hold up to approximately 90 trailered containers. The Amsterdam Site can hold up to approximately 130 trailered containers.

51.     Daybreak Express also owns the 1,600 grounded containers used by the

Metropolitan Opera to store scenery that are stored on the Ironbound Intermodal Site.

### (iv)     Delancy

52.     Delancy owns a 35.7-acre site located at 1111 Delancy Street, Newark, New Jersey operated by Port Kearney Security, Inc. ("Delancy Site"). The Delancy Site is enclosed by fencing, maintains security cameras and 24/7 security personnel and can only be accessed by a secured gate. The Delancy Site is zoned for container storage. (A copy of an aerial depiction of Delancy Site is attached hereto as Exhibit I.)

53.     Approximately 50% of the Delancy Site is used to store trucks, trailered containers and grounded containers. At any given time, the Delancy site has approximately 600 trailered containers. The Delancy Site could hold up to approximately 6,000 grounded containers.

54.     The foregoing Sites are all within Newark's industrial zones proximate to the Port. None of the foregoing Sites are proximate to residential neighborhoods.

55.     At each of the Sites, safety measures are employed to protect persons and personal property, including containers, located on those Sites.

### D.     The Prior Newark 2020 Container Ordinance As Amended in 2022

56.     In October 2020, Newark adopted Ordinance 6PSF-q 102120 ("2020 Ordinance"), a copy of which is attached hereto as Exhibit J. The 2020 Ordinance added a new chapter 22, entitled, "Shipping Containers," to Newark's Zoning and Land use regulations.

57.     The Preamble of the 2020 Ordinance recites that it was adopted under the City's general statutory authority under N.J.S.A. 40:48-2, permitting it to adopt ordinances to protect the public health, safety and welfare.

58.     The Preamble to the 2020 Ordinance further recites that "Containers present an

- 12 -

eyesore and a nuisance in the neighborhoods where they have been illegally stored" and that "within the proximity to the marine terminals, unused and abandoned containers have become a blight."

59.     The Preamble declares that "protecting the aesthetics, integrity, vitality, health, safety and welfare" of residents affected by stored containers "is of serious concern to the City."

60.     The 2020 Ordinance applied to containers placed on a Newark property for more than 30 days.

61.     Section 2 of the 2020 Ordinance prohibited the storage of containers in residential, commercial and mixed-use zones and in redevelopment areas unless expressly permitted in the redevelopment plan.

62.     Section 3 of the 2020 Ordinance required any business storing containers for more than 30 days in any zone in Newark to apply for an annual license.

63.     Section 4a of the 2020 Ordinance imposed an (a) annual license fee based on the number of containers actually stored on a property and a (b) per diem "fee" based on the length of time that each container is stored.

64.     Section 5 of the 2020 Ordinance required the owner to report monthly to the Office of Special Taxes and Licensing under penalty of perjury the number of containers on site, the number on site for 30, 60, 90 and more than 90 days, and the per diem fee owed.

65.     Section 6 of the 2020 Ordinance required applications for storage of containers to be approved by Newark Central Planning Board. It limited the stacking of containers to 4 high, requires sufficient spacing to permit inspection and rodent control, and requires installation of surveillance cameras.

66.     The 2020 Ordinance was amended in April 2022 by Ordinance 6 PSF-d ("2022

Ordinance"), a copy of which is attached as Exhibit K.

67.     The preamble of the 2022 Ordinance recited that it was enacted under the City's general statutory authority under N.J.S.A. 40:48-2 to enact ordinances to protect the public health, safety and welfare.

68.     The preamble to the 2022 Ordinance further recited:

> Whereas, the [2020] Ordinance was intended to regulate the illegal storage of shipping containers in neighborhoods, which are hazardous or detrimental to the health, safety and welfare of the residents, and are an eyesore and a nuisance and contribute to blight in various residential neighborhoods; and

> Whereas. shipping containers stacked in neighborhoods with no municipal oversight can be dangerous and can become an attractive nuisance without having safeguards inherent in the way that shipping containers are stored on-port in the Port Newark Container Terminal and others; and

> Whereas in light of stringent safety protocols put in place by Port Newark Container Terminal and other on-port shipping companies, the concerns for the storage of containers on-port is not the same as for the storage of containers off-port ….

69.     The 2022 Ordinance added a new subsection 6(e) that exempted from the license requirement for Container Storage Operators: (i) whose principal business is shipping, (ii) whose premises are on property leased from the Port Authority contiguous to shipping waterways, (iii) whose safety protocols have been approved by the Port Newark Container Terminal, which is a tenant of the Port Authority, (iv) allow Newark to conduct periodic inspections of their property, and (v) submit a safety report to Newark's Department of Engineering. Exempt Container Storage Operators are also allowed to stack containers 8 high.

70.     Upon information and belief, the City determined to exempt the Port Authority's tenants in response to discussions with the Port Authority.

71.     Although adopted by the Municipal Council, the City's Office of Planning and

Zoning did not enforce the 2020 Ordinance and the 2022 Ordinance although, upon information and belief, certain Container Operators complied with its requirements.

**E.      The 2024 Newark Container Ordinance Was Adopted By the Municipal Council on June 5, 2024, Published On June 20, 2024 and Effective As of June 25, 2024.**

72.     On June 5, 2024, the Newark Municipal Council by a vote of 5-4 adopted Ordinance 6PSF-a ("2024 Ordinance"), a copy of which is attached as Exhibit L. The 2024 Ordinance expands the coverage of the 2020 Ordinance's license requirement.

73.     Like its predecessors, the preamble of the 2024 Ordinance recites that it is enacted under the City's general statutory authority under N.J.S.A. 40:48-2 to enact ordinances to protect the public health, safety and welfare.

74.     The Preamble to the 2024 Ordinance further recites that off-port businesses that have intermodal containers on site do not have adequate oversight by the City and that the City "intends to regulate and bring oversight" to businesses that have containers on site because containers "can be dangerous and can become attractive nuisances without having proper safeguards inherent in the way intermodal containers are stored."

75.     The Preamble also recites that "the City desires to move certain regulations from the Zoning Office to the Division of Tax Abatement and Special Taxes of the Finance Department."

76.     Section 20 of the 2024 Ordinance repeals all inconsistent prior ordinances or parts of ordinances.

77.     The definitions in Section 1 of the 2024 Ordinance expand the businesses subject to its license requirement beyond the 2020 Ordinance. Specifically:

(a)      "Intermodal container operator" is defined as "any owner, manager, company, or other entity that has intermodal containers on site for any use."

- 15 -

(b)    "Owner" is defined as a person with "legal ownership of real property within the City of Newark."

(c)    "Stored" is defined as "placed or left on a parcel for any length of time."

(d)    A "parcel" is defined as "a tract or plot of land within the City of Newark."

(e)    "Storage period" is defined as "the period of time during which the intermodal container has been stored on the premises."

78.    Section 2 of the 2024 Ordinance requires "any person, business and/or operator having and/or storing intermodal containers on any parcel within the City of Newark" to apply for an "Intermodal Container Lot License."

79.    As a result of these definitions, any person, whether an owner or an operator, that has a container located on its premises for any length of time, however brief, whether grounded or trailered, is required to obtain a license.

80.    Section 3(c) of the 2024 Ordinance requires the applicant to submit a drawing approved by the City's Department of Engineering showing the layout of the parcel, the flooring or ground surface, the lighting, and the number and location of fire equipment. It provides no standards for approval by the Department of Engineering.

81.    Section 3(b)(7) requires the application to include "the maximum number of intermodal containers which may, at one time, be stored upon the premises."

82.    Section 3(e) prohibits issuance of a license unless the parcel is approved for container storage under the City's zoning ordinance, or a permit is granted as a variance from the zoning ordinance.

83.    Section 5 of the 2024 Ordinance imposes one of two license fee schemes at the licensee's option.

(a)   Option 1 is based on "the maximum number of intermodal containers that can fit on the parcel according to zoning restrictions":

| | |
|---|---|
| 1-500 | $2,000 |
| 501-1,000 | $4,000 |
| 1,001-2,000 | $6,000 |
| Above 2000 | $6,000 plus $2.50 per additional container. |

Option 1 also imposes a per diem "fee" based on the length of time that a container is stored:

| | |
|---|---|
| Day 1 through 30 | $0.20 per container per day |
| Day 31 through 60 | $0.30 per container per day |
| Day 61 through 90 | $0.50 per container per day |
| Above 90 days | $1.00 per container per day |

(b)   Option 2 is also based on "the maximum number of intermodal containers that can fit on the parcel according to zoning restrictions," but without any per diem charge:

| | |
|---|---|
| 1-500 | $20,000 |
| 501-1,000 | $40,000 |
| 1,001-2,000 | $60,000 |
| Above 2,000 | $60,000 plus $25.00 per additional container |

84.   Section 9 of the 2024 Ordinance requires any licensee using fee option 1 to submit monthly a "Dwell Time Report" stating the total number of containers on site and the time each container has been on site and to remit with the report any fees due.

85.   The regulatory requirements of the 2024 Ordinance beyond obtaining and paying for the license are minimal. Those requirements include:

(a)   Section 4 requires the licensee to have liability insurance of $1 million per occurrence and $3 million aggregate.

(b)   Section 10 requires a barrier or guard rail along the lot line to prevent containers from damaging "walls, fences or other adjacent property."

(c)   Section 11 requires that the parcel "be kept free of debris, so as not to

- 17 -

become a nuisance," "maintained in good and safe condition," and "adequately drained so that it does not retain water."

(d)  Section 12 requires each parcel to be adequately lighted with the approval of the Electrical Subcode Official, but only "when in operation during hours of darkness."

(e)  Section 13 requires sufficient firefighting equipment as approved by the Division of Fire.

86.  The 2024 Ordinance does not require fencing, guards, or security cameras.

87.  The 2024 Ordinance does not provide for periodic inspections.

88.  In contrast to the provisions of Section 18 for Container Storage Operators on Port Authority premises, the 2024 Ordinance does not require reporting of safety protocols to the City.

89.  Section 18(a) of the Ordinance exempts from the license requirement intermodal container operators that (i) are "marine terminal operators" as defined by 46 U.S.C. § 40102(15), located on property leased by the Port Authority, (iii) who provide an annual briefing regarding safety protocols employed at their facility to the City.

90.  Each of Plaintiffs is an Intermodal Container Operator or Owner as defined in the 2024 Ordinance and is subject to the license requirement, fee schedule, and other provisions of the 2024 Ordinance.

91.  The Newark City Clerk certified the 2024 Ordinance on June 14, 2024, and notice of the Ordnance's adoption was published in *the Star Ledger* on June 20, 2024, as required by N.J.S.A.40:49-2(d).

92.  The 2024 Ordinance was effective 20 days after it was adopted on June 25, 2024.

- 18 -

93.     On June 26, 2024, one day after the 2024 Ordinance went into effect, the City commenced efforts to enforce compliance with the 2024 Ordinance by distributing applications and conducting inspections of Newark properties owned and operated by persons that either house containers, transition containers or have the capacity to store containers. (A copy of the City's letter dated June 26, 2024 with the enclosed Application is attached hereto was Exhibit M).

94.     The City demanded that owners and operators submit completed applications to the City by July 5, 2024. By its notice delivered to Container Operators that was received by Container Services on July 29, 2024, the City demanded that the Container Operators cease all operations at their respective premises in Newark if they failed to comply with the Ordinance including the payment of license fees, and threatened remedies to shut down the businesses if they did not comply.  (See undated letter from the City attached hereto as Exhibit N).

95.     The City's enforcement of the 2024 Ordinance will negatively impact Plaintiffs by (a) decreasing the fair market value of the rental of premises that has a highest and best use for operations that include the transfer and/or storage of containers; (b) creating an unfair competitive advantage for Container Storage Operators that are exempt from the 2024 Ordinance; (c) compelling the owners and Container Storage Operators covered by the 2024 Ordinance to pass the increased costs associated with the 2024 Ordinance to their respective customers, tenants and occupants; (d) dissuade prospective Container Storage Operators from leasing property in Newark that has a highest and best use for operations that include the transfer and/or storage of containers; (e) causing Container Storage Operators to reduce their respective work forces by eliminating jobs to offset the newly incurred license fees imposed by the 2024 Ordinance; and (f) leading to certain Container Storage Operators leaving the City and moving,

either the entirety of their business or that portion that requires them to store containers, to neighboring municipalities.

## **COUNT ONE**
### **(Generating Revenue In Violation of N.J.S.A. 40:48-2)**

96.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of the Verified Complaint as if fully set forth herein.

97.     The 2024 Ordinance recites that it is enacted under the City's authority conferred by N.J.S.A. 40:48-2 to enact ordinances to protect the public health, safety and welfare.

98.     N.J.S.A. 40:48-2 authorizes municipalities to levy fees that are reasonably necessary to defray the cost of regulatory measures enacted pursuant to the statute, but it does not authorize municipalities to levy fees beyond that level for the purpose of raising revenue for general budgetary purposes.

99.     The power to levy license fees for revenue purposes is not inherent in municipal corporations. The power of taxation is vested in the State legislature. Municipalities, being merely creatures of the State, have no power of taxation unless it is plainly delegated to them by the legislature.

100.    Notably, the State legislature acknowledges there is no enabling statute for the municipalities to impose a tax on shipping containers. Presently, there is a proposed bill in the Legislature for an act authorizing municipalities to impose taxes on the storage of empty shipping containers.

*See* https://www.njleg.state.nj.us/bill-search/2024/S2171/billtext?f=S2500&n=2171_I1

101.    The 2024 Ordinance is an unauthorized, naked attempt to generate revenue and constitutes a tax on shipping containers which has not been authorized by the State legislature and which has no reasonable relation to the issue it purports to address.

102.     The fees imposed by the 2024 Ordinance bear no relation to the cost incurred by the City to regulate the storage of containers under the Ordinance for the following reasons:

(a)     Other than issuing the permit and collecting the fees, Newark imposes only minimal regulation of container storage under the Ordinance.

(b)     The 2024 Ordinance does not provide for any inspection by the City.

(c)     The 2024 Ordinance does not require licensees to fence or guard their properties or to provide video surveillance.

(d)     The 2024 Ordinance does not require licensees to implement specific safety protocols or to report safety protocols to any regulatory authority in Newark.

(e)     Although the 2024 Ordinance and its predecessors recite that the problem to which they are addressed is the harm caused by the storage of containers, the 2024 Ordinance also requires a license and accompanying fee for trailer mounted transient containers that are parked on a property as briefly as a part of one day.

(f)     The Option 1 fee structure is a sliding scale based on a combination of the maximum number of containers that can potentially be stored on the licensed parcel and the length of time that each individual container is stored on the parcel. The cost of regulation does not vary with either option.

(g)     The purpose and effect of Option 1 is to generate revenue for the City based on the potential magnitude of the licensee's operations rather than the cost of regulating them.

(h)     The Option 2 fee structure is also a sliding scale based on the potential number of containers that can be stored on the licensed parcel. In return for not having to pay a monthly fee based on dwell time as under Option 1, the licensee is charged a flat fee 10 times

greater than the monthly fee under Option 1. The minimum fee under Option 2 for a business that occasionally has trailered containers parked on its premises is $20,000.

(i)      As with Option 1, the cost of regulation does not vary with the potential number of containers that can potentially be stored on the licensed parcel.

(j)      By basing the license fee on the number of containers that potentially can be stored on the site rather than the number that are physically present at any given time, both fee structures generate revenue without regard to the ostensible purpose of limiting the number of containers stored.

(k)      The 2024 Ordinance transfers enforcement of the container regulations from the City's Zoning Office to its Division of Tax Abatement and Special Taxes in its Finance Department.

(l)      On information and belief, the City is facing a budget shortfall and admits it needs a new source of revenue to avoid increasing taxes on its residents.

WHEREFORE, Plaintiffs demand judgment in their favor and against The City of Newark as follows:

A.      Declaring that the fees imposed by the 2024 Ordinance bear no relation to the cost incurred by the City to regulate the storage of containers under the Ordinance and the Ordinance is invalid and of no effect.

B.      Preliminary and final injunctive relief enjoining the City and its employees and representatives from enforcing the 2024 Ordinance including, but not limited to, further collection of fees under the 2024 Ordinance.

C.      Compelling the City to refund all collected fees collected by the City under the 2024 Ordinance.

D.     Awarding them their attorney's fees and costs of suit; and

E.     Such other and further relief as the Court deems just and proper.

## COUNT TWO
**(Arbitrary and Capricious In Violation of N.J.S.A. 40:48-2)**

103.    Plaintiffs repeat and reallege the allegations of set forth in the foregoing paragraphs of the Verified Complaint as if fully set forth herein.

104.    While N.J.S.A. 40:48-2 confers broad discretion on municipalities to enact ordinances to protect the public health, safety and welfare, it requires that such ordinances have a rational basis.

105.    The predecessors to the 2024 Ordinance recite that containers stored for more than 30 days on site pose aesthetic and other threats to public health, safety and welfare.

106.    The 2024 Ordinance recites that it is necessary because containers present an attractive nuisance. The doctrine of attractive nuisance is a principle of tort liability that requires property owners to anticipate and take precautions against the acts of trespassing children.

107.    None of the Sites operated and/or owned by Plaintiffs where containers are stored are in a residential area or any area where it is reasonably foreseeable that children will be likely to trespass on the sites operated by the Container Operators thereby exposing themselves to injury.

108.    The City's claim that containers are unsafe and require regulation is a pretext for the City's desire to increase revenue for its general funds, *i.e.,* a tax.

109.    The 2024 Ordinance defines an Intermodal Container Operator requiring a license as any person who has even a single container on site for any period, however brief. These definitions are broad enough to included not only grounded containers, as under the 2020 Ordinance, but trailered containers parked temporarily while awaiting further shipment, loading

or unloading.

110.   The 2024 Ordinance does not identify any danger to the public health, safety and welfare posed by grounded containers and/or temporarily parked trailered containers. As such, its purported basis is arbitrary and capricious.

111.   The 2024 Ordinance is arbitrary and capricious and without rational basis to the extent it imposes licensing and fee obligations on Off-Port Container Operators while exempting on-Port operators and/or owners of real property that do not operate any business using containers on the property and only lease the property to Container Operators.

112.   The 2024 Ordinance is arbitrary and capricious and without rational basis to the extent that it applies to grounded containers and trailer-mounted containers temporarily parked while in transit, loading or unloading.

113.   The 2024 Ordinance is arbitrary and capricious and without rational basis to the extent the fees imposed by the 2024 Ordinance bear no relation to the cost incurred by the City to regulate the storage of containers under the Ordinance.

WHEREFORE, Plaintiffs demand judgment in their favor and against The City of Newark as follows:

A.     Declaring that the 2024 Ordinance is arbitrary, unreasonable and/or capricious and therefore invalid and of no further effect.

B.     Preliminary and final injunctive relief enjoining the City and its employees and representatives from enforcing the 2024 Ordinance including, but not limited to, further collection of fees under the 2024 Ordinance.

C.     Compelling the City to refund all collected fees collected by the City under the 2024 Ordinance.

D.      Awarding them their attorney's fees and costs of suit; and

E.      Such other and further relief as the Court deems just and proper.

## COUNT THREE
### (Interference With Interstate and Foreign Commerce)

114.    Plaintiffs repeat and reallege the allegations of set forth in the foregoing paragraphs of the Verified Complaint as if fully set forth herein.

115.    United States Constitution Art. I, § 8, cl. 3, the Commerce Clause, authorizes Congress "to regulate commerce with foreign nations and among the several states."

116.    The Commerce Clause prohibits state and local measures that impose a burden on interstate and foreign commerce that is clearly excessive in relation to the state or local interest protected.

117.    Intermodal shipping containers are an essential apparatus for the movement of foreign goods through the Port of New York and New Jersey and for onward shipment in interstate commerce.

118.    Containers are under the ownership and control of the shipping lines that bring them to the Port. Under the UIIA agreement, they must be returned by the consignee to the shipping line or its designee within a set period.

119.    Because the flow of imports into the Port greatly exceeds the flow of exports, empty containers returned to shipping lines tend to accumulate until they can be returned empty by ship to ports in exporting countries.

120.    The Port Authority does not permit the long-term storage of empty containers on property within the Port. Therefore, shipping lines contract with Container Storage Operators in Newark to store empty containers until the shipping line determines to return them to ports in exporting countries.

121.    Containers are individually identifiable by number. Since containers of the same size and design are interchangeable, however, the practice of shipping lines is to request a certain number of containers of the appropriate size without regard to the individual identity. As a result, the most accessible containers in a storage facility are returned relatively quickly, and the least accessible tend to remain.

122.    The per diem fee structure of Option 1 of the 2024 Ordinance, because it is based on the length of time a container has been stored on site, has the intent and effect of deterring the storage of empty containers until the responsible shipping line requires their return for export. This imposes a burden on foreign and interstate commerce by penalizing the length of time that containers are stored before export for reuse.

123.    The per diem fee structure is arbitrary because it is levied on the Intermodal Container Operator, who does not control the length of time a container is stored before export for reuse.

124.    By penalizing the storage of containers until the needs of foreign commerce require the shipping company to return them empty to exporting ports, the per diem fee structure conflicts with the policy of the United States declared in 46 U.S.C. § 80503(e) to "encourage the development and use of intermodal transport, using containers built to facilitate economical, safe, and expeditious handling of containerized cargo without intermediate reloading when it is being transported over land, air, and sea areas."  It likewise conflicts with the policy of the United States declared in 49 U.S.C. § 5501(a) "to develop a National Intermodal Transportation System that is economically efficient and environmentally sound, provides the foundation for the United States to compete in the global economy, and will move individuals and property in an energy efficient way."

125.    The City of Newark has no legitimate interest in interfering with the storage of containers for the times dictated by the requirements of the import-export cycle.

126.    Assuming for the purposes of this count only that the City of Newark has a legitimate interest under New Jersey law in charging a license fee based on the number of containers stored on a parcel, it can satisfy that interest by the less restrictive means of a fee based on the number of containers that are actually stored without regard to dwell time.

127.    The capacity-based structure of both fee options imposes a charge based on the Container Storage Operator's ability to engage in an activity essential to the flow of interstate and foreign commerce through Port Newark. No legitimate interest of the City of Newark in protecting local health, safety and welfare is served by imposing a charge based on the potential number of containers stored on a parcel rather than the number that are actually stored.

WHEREFORE, Plaintiffs demand judgment in their favor and against The City of Newark as follows:

A.      Declaring that the 2024 Ordinance violates the Commerce Clause of the U.S. Constitution and is unconstitutional on its face and therefore is invalid and of no further effect.

B.      Preliminary and final injunctive relief enjoining the City and its employees and representatives from enforcing the 2024 Ordinance including, but not limited to, further collection of fees under the 2024 Ordinance.

C.      Compelling the City to refund all collected fees collected by the City under the 2024 Ordinance.

D.      Awarding them their attorney's fees and costs of suit; and

E.      Such other and further relief as the Court deems just and proper.

## COUNT FOUR
### (Violation of Equal Protection
### U.S. Const. amend XIV)

128.    Plaintiffs repeat and reallege the allegations of set forth in the foregoing paragraphs of the Verified Complaint as if fully set forth herein.

129.    United States Constitution, Amendment 14, § 1 provides in pertinent part that no state shall deprive any person of the equal protection of the laws. For the purposes of the Equal Protection Clause, the action of a municipal corporation such as the City of Newark is the action of the state under which it is established.

130.    Section 18(a) 2024 Ordinance exempts from the license, fee and other requirements imposed on Container Storage Operators those Operators who meet three criteria: (i) they are "marine terminal operators" as defined by 46 U.S.C. § 40102(15), located on property leased by the Port Authority, (iii) who provide an annual briefing regarding safety protocols at their facility to the City.

131.    A "marine terminal operator" is defined by 46 U.S.C. § 40102(15) in pertinent part as "a person engaged in the United States in providing wharfage, dock, warehouse or other facilities in connection with a common carrier . . .."  In turn, 46 U.S.C. § 40102(8) defines a "common carrier," in pertinent part, as a water carrier in foreign commerce for compensation.

132.    Accordingly, Section 18(a) exempts only those persons who provide facilities to shipping lines on property leased from the Port Authority.

133.    The Preamble to the 2024 Ordinance recites that the Port Newark Container Terminal and other terminal Container Storage Operators in Port Newark have safety protocols "drastically different" than off-port operators. It does not identify these protocols.

134.    The 2024 Ordinance does not it impose any safety protocols on Container Storage

Operators subject to the Ordinance except a general duty to keep their premises in safe condition. Nor does it require Container Storage Operators to report any safety protocols they might have to any regulatory authority in the City of Newark.

135.    On information and belief, the safety protocols that are actually employed by Container Storage Operators subject to the 2024 Ordinance do not differ significantly from those employed by persons exempt from the Ordinance under Section 18(a).

136.    Accordingly, there is no rational basis to impose upon Plaintiffs and other Container Storage Operators subject to the 2024 Ordinance license fees and other regulatory burdens from which the persons within Section 18(a) are exempt.

WHEREFORE, Plaintiffs demand judgment in their favor and against The City of Newark as follows:

A.    Declaring that the 2024 Ordinance as applied to them denies them equal protection of the laws in violation of the Fourteenth Amendment of the U.S. Constitution and is unconstitutional on its face and therefore is invalid and of no further effect.

B.    Preliminary and final injunctive relief enjoining the City and its employees and representatives from enforcing the 2024 Ordinance including, but not limited to, further collection of fees under the 2024 Ordinance.

C.    Compelling the City to refund all collected fees collected by the City under the 2024 Ordinance.

D.    Awarding them their attorney's fees and costs of suit; and

E.    Such other and further relief as the Court deems just and proper.

**COUNT FIVE**
**(Violation of the New Jersey Constitution**
**Equal Protection, Art. 1)**

137.    Plaintiffs repeat and reallege the allegations of set forth in the foregoing paragraphs of the Verified Complaint as if fully set forth herein.

138.    Article 1, paragraph 1 of the New Jersey Constitution forbids class legislation which arbitrarily discriminates against one and favors others in like circumstances.

139.    Article 1, paragraph 1 of the New Jersey Constitution, therefore, requires that any classification must be reasonable and not arbitrary and based upon material and substantial distinctions in differences reasonably related to the subject matter of the legislation or to considerations of public policy.

140.    There is no rational basis to impose upon Plaintiffs and other Container Storage Operators subject to the 2024 Ordinance license fees and other regulatory burdens from which the persons within Section 18(a) are exempt.

WHEREFORE, Plaintiffs demand judgment in their favor and against The City of Newark as follows:

A.    Declaring that the 2024 Ordinance as applied to them denies them equal protection of the laws in violation of the N. J. Constitution and is unconstitutional on its face and therefore is invalid and of no further effect.

B.    Preliminary and final injunctive relief enjoining the City and its employees and representatives from enforcing the 2024 Ordinance including, but not limited to, further collection of fees under the 2024 Ordinance.

C.    Compelling the City to refund all collected fees collected by the City under the 2024 Ordinance.

D.     Awarding them their attorney's fees and costs of suit; and

E.     Such other and further relief as the Court deems just and proper.

**COUNT SIX**
**(Remedies Under 42 U.S.C. § 1983**
**Based on Deprivation of U.S. Constitutional Rights)**

141.   Plaintiffs repeat and reallege the allegations of set forth in the foregoing paragraphs of the Verified Complaint as if fully set forth herein.

142.   42 U.S.C. § 1983, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

143.   Based on the foregoing alleged deprivation of Plaintiffs' rights under the Equal Protection Clause and the Interstate Commerce Clause of the U.S. Constitution, Plaintiffs are entitled to the remedies available under 42 U.S.C. § 1983.

144.   The City's adoption and enforcement of the 2024 Ordinance are both patently irrational and unrelated to any legitimate interest, and therefore violates Plaintiffs' substantive due process and equal protection rights under the Fourteenth Amendment.

145.   The City's adoption and enforcement of the 2024 Ordinance impose a burden on interstate and foreign commerce that is clearly excessive in relation to the state or local interest protected, and therefore violates Plaintiffs' substantive due process and equal protection rights under the Fourteenth Amendment.

146.   The City's adoption and enforcement of the 2024 Ordinance, taken under color of

state law, has been exercised for the purpose of depriving Plaintiffs of their constitutional rights and protections.

147.    Plaintiffs are entitled to the remedies available to them under 42 U.S.C. § 1983 including, but not limited to, injunctive relief and attorney's fees.

WHEREFORE, Plaintiffs demand judgment in their favor and against The City of Newark as follows:

A.    Declaring that the 2024 Ordinance as applied to them denies them equal protection of the laws in violation of the Fourteenth Amendment of the U.S. Constitution and is unconstitutional on its face and therefore is invalid and of no further effect.

B.    Declaring that the 2024 Ordinance violates the Commerce Clause of the U.S. Constitution and is unconstitutional on its face and therefore is invalid and of no further effect.

C.    Declaring that the 2024 Ordinance as applied to them denies them equal protection of the laws in violation of the U.S. Constitution and the New Jersey Constitution and is unconstitutional on its face and therefore is invalid and of no further effect.

D.    Preliminary and final injunctive relief enjoining the City and its employees and representatives from enforcing the 2024 Ordinance including, but not limited to, further collection of fees under the 2024 Ordinance.

E.    Compelling the City to refund all collected fees collected by the City under the 2024 Ordinance.

F.    Awarding them all other relief that can be afforded under 42 U.S.C. § 1983.

G.      Awarding them their attorney's fees and costs of suit; and

H.      Such other and further relief as the Court deems just and proper.

### COUNT SEVEN
**(Remedies Under New Jersey Civil Rights Law
Based on Deprivation of U.S. and N.J. Constitutional Rights)**

148.    Plaintiffs repeat and reallege the allegations of set forth in the foregoing paragraphs of the Verified Complaint as if fully set forth herein.

149.    The New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et seq.* ("NJCRA"), protects Plaintiffs' substantive due process and equal protection rights under the laws of the United States and State of New Jersey including the protections afforded by the United States Constitution and New Jersey Constitution.

150.    Pursuant to N.J.S.A. 10:6-2(e), this Court may award a civil penalty to Plaintiffs for each violation and determine the appropriate amount of the penalty to be imposed on the City.

151.    Pursuant to N.J.S.A. 10:6-2(f), "in addition to any damages, civil penalty, injunction, or other appropriate relief awarded in an action brought pursuant to subsection (c) of this section, the Court may award, the prevailing party reasonable attorneys, fees, and costs."

152.    The City has deprived Plaintiffs of their substantive due process rights by exempting Container Storage Operators that are marine terminal operators in or about Port Newark.

153.    There is no rational basis to impose upon Plaintiffs and other Container Storage Operators subject to the 2024 Ordinance license fees and other regulatory burdens from which the persons within Section 18(a) are exempt.

154.    Accordingly, Plaintiffs are entitled to the remedies available to them under

NJCRA including, but not limited to, injunctive relief and attorney's fees.

WHEREFORE, Plaintiffs demand judgment in their favor and against The City of Newark as follows:

A. Declaring that the 2024 Ordinance as applied to them denies them equal protection of the laws in violation of the Fourteenth Amendment of the U.S. Constitution and is unconstitutional on its face and therefore is invalid and of no further effect.

B. Declaring that the 2024 Ordinance violates the Commerce Clause of the U.S. Constitution and is unconstitutional on its face and therefore is invalid and of no further effect.

C. Declaring that the 2024 Ordinance as applied to them denies them equal protection in violation of the New Jersey Constitution and is unconstitutional on its face and therefore is invalid and of no further effect.

D. Preliminary and final injunctive relief enjoining the City and its employees and representatives from enforcing the 2024 Ordinance including, but not limited to, further collection of fees under the 2024 Ordinance.

E. Awarding them all other relief that can be afforded under NJCRA.

F. Compelling the City to refund all collected fees collected by the City under the 2024 Ordinance.

G. Awarding them their attorney's fees and costs of suit; and

H. Such other and further relief as the Court deems just and proper.

## COUNT EIGHT
### (Declaratory Judgment)

155.    Plaintiffs repeat and reallege the allegations of set forth in the foregoing paragraphs of the Verified Complaint as if fully set forth herein.

156.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, provides that a court "[i]n a case of actual controversy within its jurisdiction . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

157.    28 U.S.C. § 2202 provides: "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

158.    Plaintiffs are each an "interested party" under 28 U.S.C. § 2201(a).

159.    The City maintains that it enacted the 2024 Ordinance in accordance with appliable law and in furtherance of the powers given to it by the State legislature.

160.    Plaintiffs maintain that City has adopted and has commenced enforcement of the 2024 Ordinance that contains arbitrary and capricious provisions and provisions that have no rational basis.

161.    Plaintiffs dispute that the 2024 Ordinance was properly enacted under applicable law and/or is consistent with the rights, privileges and protections afforded by the New Jersey and United States Constitutions.

162.    Accordingly, an actual controversy exists between the City and the Plaintiffs concerning the validity and constitutionality of the 2024 Ordinance.

163.    By reason of the foregoing, a declaratory judgment is necessary and proper to set forth and establish that the City is not empowered to enforce the 2024 Ordinance and that it is

invalid and of no force and effect.

WHEREFORE, Plaintiffs demand judgment in their favor and against The City of Newark as follows:

A.   Declaring that the fees imposed by the 2024 Ordinance bear no relation to the cost incurred by the City to regulate the storage of containers under the Ordinance and therefore the Ordinance is invalid and of no effect.

B.   Declaring that the 2024 Ordinance is arbitrary, unreasonable and/or capricious and therefore is invalid and of no further effect.

C.   Declaring that the 2024 Ordinance as applied to them denies them equal protection of the laws in violation of the Fourteenth Amendment of the U.S. Constitution and is unconstitutional on its face and therefore invalid and of no further effect.

D.   Declaring that the 2024 Ordinance violates the Commerce Clause of the U.S. Constitution and is unconstitutional on its face and therefore is invalid and of no further effect.

E.   Declaring that the 2024 Ordinance as applied to them denies them equal protection of the laws in violation of the N.J. Constitution and is unconstitutional on its face and therefore invalid and of no further effect.

F.   Preliminary and final injunctive relief enjoining the City and its employees and representatives from enforcing the 2024 Ordinance including, but not limited to, further collection of fees under the 2024 Ordinance.

G.   Compelling the City to refund all collected fees collected by the City under the 2024 Ordinance.

H.      Awarding them their attorney's fees and costs of suit; and

I.      Such other and further relief as the Court deems just and proper.

SILLS CUMMIS & GROSS, P.C.
*Attorneys for Plaintiffs*


By: _/s/ Michael J. Geraghty_
   MICHAEL J. GERAGHTY

Dated: July 30, 2024

## **LOCAL CIVIL RULE 11.2 CERTIFICATION**

I, counsel of record for Plaintiff in the above-¬referenced matter, hereby certify that the matter in controversy is not the subject of any other action pending in any court, or any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

SILLS CUMMIS & GROSS, P.C.
*Attorneys for Plaintiffs*


By:   */s/ Michael J. Geraghty*
      MICHAEL J. GERAGHTY

Dated: July 30, 2024

## **CERTIFICATION OF NONARBITRABILITY**
## **PURSUANT TO LOCAL RULE 201.1(d)**

I, counsel of record for Plaintiff in the above-captioned action, hereby certify that the relief requested in this matter includes non-monetary relief, and is based, in part, on an alleged violation of a right secured by the Constitution of the United States. Accordingly, Local Rule 201.1(d) does not apply to this matter and compulsory arbitration is excluded.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

SILLS CUMMIS & GROSS, P.C.
*Attorneys for Plaintiffs*


By:   */s/ Michael J. Geraghty*
      MICHAEL J. GERAGHTY

Dated: July 30, 2024

**<u>VERIFICATION</u>**

FRANK BORLAND, deposes and says:

1.      I am the President of (a) Ironbound Intermodal Industries, Inc., a New Jersey corporation, and (b) Ironbound Express, Inc., a New Jersey corporation, which are each a plaintiff in the foregoing Verified Complaint.

2.      I have read the foregoing Verified Complaint. The facts contained therein are based upon my personal knowledge, my review of documents and other information, and information supplied to me by other persons. As to facts based upon my personal knowledge, they are true. As to facts based upon my review of documents and other information, and information supplied by others, I believe them to be true. As to facts directed at other plaintiffs in this action, I rely on their respective verifications of such facts.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on: July 30, 2024.

FRANK BORLAND

## VERIFICATION

ROBERT CASTELO, deposes and says:

1.      I am the President of (a) Marine Transport of New Jersey, Inc., a New Jersey corporation, and (b) Container Services of New Jersey, Inc., a New Jersey corporation, which are each a plaintiff in the foregoing Verified Complaint.

2.      I have read the foregoing Verified Complaint. The facts contained therein are based upon my personal knowledge, my review of documents and other information, and information supplied to me by other persons. As to facts based upon my personal knowledge, they are true. As to facts based upon my review of documents and other information, and information supplied by others, I believe them to be true. As to facts directed at other plaintiffs in this action, I rely on their respective verifications of such facts.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on: July 30, 2024.

_____
ROBERT CASTELO

## **VERIFICATION**

SCOTT FIELDS, deposes and says:

1.    I am the Chief Executive Officer of Daybreak Express, Inc., a New Jersey corporation, which is a plaintiff in the foregoing Verified Complaint.

2.    I have read the foregoing Verified Complaint. The facts contained therein are based upon my personal knowledge, my review of documents and other information, and information supplied to me by other persons. As to facts based upon my personal knowledge, they are true. As to facts based upon my review of documents and other information, and information supplied by others, I believe them to be true. As to facts directed at other plaintiffs in this action, I rely on their respective verifications of such facts.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on: July 30, 2024.

_____
SCOTT FIELDS

## VERIFICATION

JAMES RHATICAN, deposes and says:

1.      I am the Vice President of Land Use and Development and Assistant General Counsel of 1111 Delancy Street LLC, a New Jersey limited liability company, which is a plaintiff in the foregoing Verified Complaint.

2.      I have read the foregoing Verified Complaint. The facts contained therein are based upon my personal knowledge, my review of documents and other information, and information supplied to me by other persons. As to facts based upon my personal knowledge, they are true. As to facts based upon my review of documents and other information, and information supplied by others, I believe them to be true. As to facts directed at other plaintiffs in this action, I rely on their respective verifications of such facts.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on: July 31, 2024.

JAMES RHATICAN